411 F.2d 959
 71 L.R.R.M. (BNA) 2437
 A. H. BELO CORPORATION (AFAA-TV), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
LOCAL UNION 1257, INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
A. H. BELO CORPORATION (WFAA-TV), Respondent.
 Nos. 25991, 26459.
 United States Court of Appeals Fifth Circuit.
 May 23, 1969.
Rehearing Denied July 28, 1969.
 
 Larry M. Lesh, Locke, Purnell, Boren, Laney & Neely, Joseph Alton Jenkins, Joseph Alton Jenkins & Associates, Dallas, Tex., for A. H. Belo Corporation.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., Elmer P. Davis, Director, 16th Region, N.L.R.B., Fort Worth, Tex., Gary Green, atty., N.L.R.B., Washington, D.C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter Kinzler, Atty., for N.L.R.B.
 L. N. D. Wells, Jr., Mullinax, Wells, Mauzy, Levy & Richards, Dallas, Tex., for Local Union 1257 of the Intl. Brotherhood of Elec. Wkrs., AFL-CIO.
 Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.
 COLEMAN, Circuit Judge:
 
 
 1
 This is a proceeding to review an order of the National Labor Relations Board issued against the petitioner, A. H. Belo Corporation (WFAA-TV), April 17, 1968. Except as to the Cedar Hill situation the Board orders will be enforced.
 
 
 2
 In its decision and order, the Board found that Belo Corporation had violated 8(a)(5) and (1) of the Act, 29 U.S.C. 151 et seq., by failing and refusing to meet with the union at reasonable times for purposes of collective bargaining, by conducting negotiations with the union without a sincere desire to reach an agreement, and by unilaterally making changes in the working conditions of its employees during the period of collective bargaining.
 
 
 3
 The Board ordered the company to cease and desist from refusing to bargain in good faith with the union and from discontinuing the normal and regular wage increases and other benefits. Affirmatively the company was ordered to bargain in good faith, to meet the confer at reasonable times, to afford the union an opportunity to bargain collectively with respect to any changes in wages, benefits, or other terms and conditions of employment, and to make whole its employees for any losses suffered as a result of its discontinuance of wage increases.
 
 
 4
 Belo Corporation, a Dallas, Texas corporation, is the owner and operator of radio stations WFAA-AM and WFAA-FM, and television station WFAA-TV. It also publishes the Dallas Morning News, a daily newspaper. The unfair labor practices charged concerned only the company's operation of WFAA-TV.
 
 
 5
 In October 1965, Local 1257, International Brotherhood of Electrical Workers, AFL-CIO, claimed representation of a majority of the engineering department employees of WFAA-TV (exclusive of production and maintenance employees, general office workers and announcers) and sought recognition from the company as the exclusive bargaining agent of those employees. Less than a month later, the company granted the union recognition, stating that there was no necessity for either a card check or an election.
 
 
 6
 Negotiations for a contract began a short time later. During the course of the negotiations, the parties met twenty-seven times, from March 3, 1966 to May 16, 1967. It was the company's position at the beginning and throughout the sessions that because of bargaining commitments with other unions it would be unable to meet more than once a week for a period of two hours. The company was usually represented by Richard Blum and Audrey Jenkins, while A. R. Brewton spoke for the union.
 
 
 7
 At the first meeting, the union submitted a comprehensive thirty-four page proposal. The company asked for a delay in further meetings in order to have a chance to study it. After waiting two months the company countered with a four page proposal, including only such basic subjects as hours and wages, omitting items dealing with grievance-arbitration procedures, vacation benefits, and no-strike, no lockout provisions. At the third meeting, the company flatly rejected the union's requests for a no-strike, no-lockout clause and an automatic renewal clause.
 
 
 8
 On May 31, the company rejected the suggestion that the contract include a provision that an employee could be discharged only for 'just cause', insisting that it had a right to discharge any employee for any reason not prohibited by the Act. At that point, Brewton, the union negotiator, remarked to the company negotiator, Blum, 'You must feel the Company is God.' To that, Blum retorted, 'We are God as far as the (employees) * * * wages, hours, and working conditions.'
 
 
 9
 The parties met again June 7, but only Jenkins was present to represent the company. Overtime pay was discussed. Although the company's formal proposal was for overtime after 40 hours, Jenkins admitted that the company's newspaper bargaining units were paid overtime after a certain prescribed shift. The union then requested that the Local 1257 employees be paid on such basis. Jenkins was non-committal. When Jenkins was asked about vacation benefits, he replied that they were included in the company's rule book and could possibly be included in the contract. He stated that he personally had no objection to making the rule book available to the union.
 
 
 10
 At the next meeting, Blum was present and announced that he was opposed to the company's paying overtime after a prescribed shift, since, in his opinion, anything that was costlier to the company would be considered unreasonable. (The company did ultimately agree to the union's overtime proposal.) Blum also rejected the union's proposal that the company's existing practice as to sickness, retirement, and death benefits be incorporated into the bargaining agreement, claiming that the company preferred to deal with these matters on a case-by-case basis. This same position was taken regarding jury pay. At this meeting Brewton sought to obtain longer, more frequent bargaining sessions, and although Blum stated that the company might be able to add an extra session occasionally, the sessions proceeded substantially as before. Blum did indicate that he would be on vacation for three weeks during July and August.
 
 
 11
 On July 12, the company rejected, as unreasonable, the union's proposal for seven paid holidays, certain safety measures, and travel pay. Although Blum did agree to submit in writing the company's present practice on travel pay, this was never done. At the following meeting, the company again stated its refusal to put in writing its present practice regarding sickness, retirement, and death benefits, insisting that these be reviewed on an individual basis.
 
 
 12
 The August 16 and September 6 sessions proved as futile and exasperating as the previous ones. On these occasions, the union's proposals as to employee discipline and discharge were again rejected. In addition, the company refused to include a provision on lay-offs in the proposed contract, reasoning that if one were included, the company would have to use it and lay employees off. Finally, the company rejected a proposal on arbitration, stating that it preferred to settle its differences in the courts.
 
 
 13
 The question of wages was raised at the September 13 meeting, with the company demanding that the agreement include the same wage rate as that used by it since late 1964. It specifically rejected the union's call for an interim wage increase, claiming that to grant it 'would shorten the company's lever to take away a pressure point'. The company wanted resolution of other matters before considering a wage increase.
 
 
 14
 Beginning with the September 20 session, a Federal mediator was present. The subject of wages was again raised but no progress was made. However, Blum did admit on questioning that wage increases had previously been given on an annual basis, or when overdue, made retroactive. Meetings were also held September 27 and October 18. At the September 27 meeting the company rejected outright the union's checkoff proposal.
 
 
 15
 The wage issue was raised for a third time on October 25, when the union again sought an interim increase, stating that it would not regard it as unlawful unilateral action. But once again the company refused, remarking that employee 'suffering was necessary, if unfortunate'. When the mediator noted that the terms upon which the parties ultimately agreed would have to be put in writing, the company replied that its formal proposal was its existing practices and the union would have to come over to it.
 
 
 16
 Work scheduling at the company's Cedar Hill transmitter station was discussed November 1. The company rejected the union's suggestion that the parties adopt the same provisions on that subject that the union had in its contracts with two other television stations, stating that it would manage the station 'as it saw fit'. On November 8, the company did concede to the first two paragraphs of the union's vacation proposal, but expressed a desire to develop its own language on the subject.
 
 
 17
 After cancellation of two sessions and time out for the Christmas holidays, the parties resumed bargaining January 10, 1967. The company again opposed a request that the parties meet more often, feeling that they should get two hours of negotiations out of their meetings before expanding them. Nevertheless, it did agree to extend the meetings past two hours. For a third time, on January 17, the company emphasized that it would not agree to putting its proposals on fringe benefits into writing, reasoning 'We were all honorable men and didn't need specific language to cover some of the areas'. In addition, the union's proposal for severance pay was rejected, since it would mean paying employees for work not actually done. At that session, Blum remarked that the employees could have a union if they wanted one but 'would be better off without it'.
 
 
 18
 At the January 31 negotiating session, the company presented its vacation proposal, as promised November 8. However, this proposal was not as liberal as the company's existing plan, since it did not provide for an extra day of vacation if a holiday fell during an employee's vacation period. Except for that feature, the proposal was identical to the union's.
 
 
 19
 Following this, there was a most unusual turn of events. Blum asked the union negotiators if they would be willing to accept as the complete contract all of the company's then existing practices and policies. Surprisingly, the union agreed, thereby retreating from all previous positions and accepting the status quo with respect to wages, hours and working conditions. Blum then reported that he would make an attempt to set out the company's rules and practices in writing, but at the same time warned that the company 'would not sign any contract that would take away the company's right to do as it pleases'. When asked what the company's practice was, he replied that it was 'to do as it sees fit to do on an unilateral basis'.
 
 
 20
 At a later session, when the union inquired about the progress the company was making in setting its current practices down in writing, it was told that there was no progress and that the company had no intention of consolidating its practices into specific contractual provisions. The company reiterated its position that it would continue to do as it saw fit and judge each case on its own merits. In Blum's words, 'We are not going to give the union anything'.
 
 
 21
 On February 21, the company did submit a proposal on arbitration, but in so doing expressed the view that arbitrators were not objective and the company would not turn its business over to them. On February 28, the Federal mediator submitted the following proposal to the parties for their approval:
 
 
 22
 'The parties hereto agree that continued amicable relations between them are necessary for the best working relationships and proper work accomplishments. To this end, the company emphasizes that the employer employee relationship in regard to rights, privileges and benefits of employees will be continued as in the past. * * *
 
 
 23
 'The union agrees that its members will continue to abide by company rules and regulations which govern employees in a fair and equal manner and prescribe certain rights and benefits for employees.
 
 
 24
 'It is understood that employees will not suffer any change of benefits or working conditions as a result of union representation or the signing of this agreement. * * *'
 
 
 25
 The company unequivocally rejected this statement as a proposed contract. It also refused again to set out its current practices in writing, emphasizing to the mediator that it would 'bargain until hell freezes over', but, in the end, the union would 'have to come over to the company proposal'. At this same session, the company rejected as 'ridiculous' the union's repeated call for an interim wage increase. Blum agreed that the employees were entitled to it but felt the company was unable to do anything because of the position it was in.
 
 
 26
 At the March 14 bargaining session the company agreed to the union proposal for a $5 increase for the Cedar Hill employees, providing the $5-$10 car allowance previously granted those employees was eliminated. Discussion on this matter was renewed March 28, and despite the union's objection to discontinuing the car allowance, the company announced its intention to put the proposal into effect by April 15. Once more the company rejected the union's request that its practices be formalized and put into writing. The parties met April 11 but no significant progress was made.
 
 
 27
 Completely frustrated in its attempt to arrive at any kind of agreement, the union presented the company with a letter May 16, charging it with refusal to bargain in good faith. The company asked for a week to reply to the charge, but no reply came forth. Thereupon, the union notified the company that it had filed a formal charge with the Board (May 29) and authorized it to file a complaint against the company. Following the issuance of the unfair labor practice charge, no further negotiations were held. At their cessation, the parties had reached tentative agreement on only four particulars: (1) inclusion of a 'zipper' clause in the contract, precluding collective bargaining on any matter not covered in the contract during the contract term; (2) hours of work and rates for overtime; (3) overtime pay after a prescribed shift; (4) institution of a meal break during long overtime shifts.
 
 
 28
 Following the breaking-off of negotiations, Jim Webb Cooper, administrative assistant to Belo's general manager, spoke on several occasions with employees who belonged to Local 1257. He asked two engineers what they thought Brewton's (the union negotiator) plans were and what the engineers were going to do. One said that they might seek employment elsewhere and inquired as to why the company would not agree to a contract like Local 1257 had with KRLD-TV. Cooper replied that such was out of the question and further stated that he had a plan for a raise for the engineers on his desk but was not able to institute it because of the negotiations with the union. He also told the men that if they had not become involved with the union, they would still be making wages comparable with the engineers at KRLD-TV.
 
 
 29
 Later, when asked by another employee if the company was about to grant a wage increase, Cooper again stated that the increase was in its final stages and on his desk and further declared that 'there would have been a ten dollar pay increase granted shortly if (you) hadn't organized'. He felt that the employees had hurt themselves by organizing, and when asked if the employees should decertify the union, answered, 'I certainly can't make a statement like that here, but if anyone would like to come into my office, then I would be in a better position to answer questions along this line'.
 
 
 30
 In still a third conversation, Cooper expressed the belief that the negotiations would be a long, drawn-out affair, and a wage increase delayed, but added, 'If 50% Of the membership would sign a statement to the effect that they had no longer wished the IBEW to represent them that chances are there would be a raise forthcoming shortly'.
 
 
 31
 Based on the negotiations and the events which followed, the trial examiner found the company failed to meet and confer at reasonable times and bargain in good faith. As he expressed it, the company's intention was 'to obstruct the bargaining process and to avoid the consummation of a collective agreement'. He further found that the company committed an unfair labor practice by unilaterally discontinuing, during the negotiations, its normal and regular practice of granting wage increases to its employees, by adding vacation benefits, and by granting a wage increase to the Cedar Hill employees. The trial examiner's decision and recommendations were adopted in toto by the Board.
 
 I. Validity of the Board's Order
 
 32
 Before reaching the merits of this controversy, we discuss a procedural issue raised by the company.
 
 
 33
 The basis of the charge filed against Belo was that the company refused to bargain in good faith. In the complaint, issued July 31, 1967, it was alleged that commencing on October 9, 1965, the company bargained with no intention of entering into a final agreement with the union, refused to meet with the union at reasonable times, and refused to furnish the union certain data. The complaint contained no allegation that the company committed an unfair labor practice by making unilateral changes in working conditions.
 
 
 34
 However, the trial examiner specifically found that the company did violate 8(a)(5) by making certain unilateral changes in the employees' working conditions while it was negotiating with the union, and ordered it to implement a $10 wage increase, which was to be made retroactive to November 3, 1965, the date the union was recognized, and to reinstate the car allowance previously given Cedar Hill employees. The company duly excepted to the findings that such unilateral changes were illegal. These findings were affirmed by the Board April 17, 1968, and the following day, the company petitioned this Court to review the Board's order.
 
 
 35
 Thereafter, on April 30, 1968, Belo filed a motion for reconsideration with the Board. For the first time, the company asserted that that portion of the order requiring it to implement a wage increase retroactively to November 3, 1965, was invalid, because the complaint nowhere alleged that the company violated the Act by instituting the unilateral changes. The company further contended in the motion, also for the first time, that the Board was barred under 10(b) of the Act from litigating this issue, since the alleged unfair practice was based on events occurring more than six months prior to the filing of the complaint. The Board denied the motion on the ground that the issues were not timely raised.
 
 
 36
 Before this Court, on oral argument and in its briefs, the company again contends that since the particular 8(a)(5) allegation was not made a part of the complaint, neither the trial examiner nor the Board could legally find that the company had engaged in an unfair labor practice arising from this item. It is the company's position that evidence concerning the wage changes was originally considered merely as background evidence and was never intended to be considered as a substantive violation of the Act.
 
 
 37
 We agree that the charge relating to the unilateral wage changes should have been made a part of the complaint, which, under the Board's own regulations, is to contain 'a clear and concise description of the acts which are claimed to constitute unfair labor practices * * *.' 29 C.F.R. 102.15. And what we say here should in no way be regarded as approval of the Board's manner of handling this issue. It would have been all too easy for the Board to amend its complaint to include this allegation 29 C.F.R. 102.17.
 
 
 38
 The company does not allege, nor do we see how it could, that it was prejudiced in any way by the omission from the complaint. Even before the formal hearing commenced, the union, which was made a party to these proceedings, notified the company that it intended to raise this issue at the hearing. A union attorney reiterated this intention in his opening statement before the trial examiner. During the hearing, testimony regarding the issue was taken. The company did not object to the testimony but proceeded to cross-examine the witnesses at length. Not once, either during the hearing itself or in its exceptions to the trial examiner's findings, did the company contend that it was not fully apprised of the charge or prejudiced by its omission from the complaint. To the contrary, in at least seven separate exceptions the company alluded to the finding as to the unilateral changes and contended only that they did not constitute a substantive violation of the Act.
 
 
 39
 The company places great reliance on Boyle's Famous Corned Beef Company v. N.L.R.B., 8 Cir., 1968, 400 F.2d 154. That case is, however, clearly distinguishable. Unlike the situation here, the alleged violations in Boyle's were neither set out in the complaint nor litigated. Furthermore, the company there made timely objections to all evidence regarding those charges not included in the complaint. In like manner, N.L.R.B. v. Sands Manufacturing Company, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939), is not in point. It is significant that in Montgomery Ward & Company v. N.L.R.B., 8 Cir., 1967, 385 F.2d 760, 763-764, the same court which held that the company in Boyle's was denied due process recognized that 'National Labor Relations Board complaints do not have to conform to the technicalities of common law pleadings and that in appropriate situations, issues fairly tried even if not specifically pleaded are to be considered'.
 
 
 40
 We are convinced, after a careful reading of the record, that this is one such situation, since the issue regarding the unilateral wage changes were fairly presented and fairly tried without objection from Belo. Consequently, we find no denial of due process. See N.L.R.B. v. Buddy Schoelkopf Products, 5 Cir., 1969, 410 F.2d 82 (No. 25, 943); cf. Russell Newman Manufacturing Company v. N.L.R.B., 5 Cir., 1966, 370 F.2d 980.
 
 
 41
 The primary thrust of the company's attack on the validity of the Board's order concerns the applicability of 10(b) of the Act, 29 U.S.C. 160(b), to these proceedings. That section provides that 'no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made'. The charge in this action was filed May 29, 1967, but the Board, in its findings, held that the company had committed an unfair labor practice in instituting the unilateral changes as far back as November 3, 1965, the date on which the union was recognized as bargaining agent for the WFAA-TV employees. The company contends that the Board's holding is improper since it concerned an unfair labor practice which occurred outside the 10(b) period.
 
 
 42
 The first question we must decide is whether 10(b) is a statute of limitations and therefore can be waived, or whether it is a substantive rule which limits the Board's power. A thorough analysis of the decided cases leads us to the conclusion that 10(b), as enacted by Congress, was meant to be and is no more than an ordinary statute of limitations. Several circuits have so held. See N.L.R.B. v. Silver Bakery, Inc. of Newton, Massachusetts, 1 Cir., 1965, 351 F.2d 37, 39; N.L.R.B. v. A. E. Nettleton Company, 2 Cir., 1957,241 F.2d 130, 133; N.L.R.B. v. Clausen, 3 Cir., 1951, 188 F.2d 439, 443; cf. N.L.R.B. v. MacMillan Ring-Free Oil Company, 9 Cir., 1968, 394 F.2d 26. The views of this Court were expressed in N.L.R.B. v. Itasca Cotton Manufacturing Company, 5 Cir., 1950, 179 F.2d 504, 506:
 
 
 43
 'That Section 10(b), as amended, is not a statute limiting the jurisdiction of the Board, but one fixing a time limitation merely, is, we think, clear from the language of the Act and from the proceedings in the congress in which an unsuccessful effort to limit the complaint power of the Board was rejected.'
 
 
 44
 The Supreme Court's decision in Local Lodge No. 1424, IAM, AFL-CIO v. N.L.R.B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1959), in no way undermines this proposition. There, the Court held that where an unfair labor practice could only be made out by reliance on matters outside the six month period, the Board was barred by 10(b) from proceeding with that charge. The Court felt that in that particular situation.
 
 
 45
 'permitting resort to the principle that 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, wound vitiate the policies underlying that section.'
 
 
 46
 362 U.S. at 419, 80 S.Ct. at 828. In so ruling, it expressly distinguished the situation now before this Court, wherein
 
 
 47
 'occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose 10(b) ordinarily does not bar such evidentiary use of anterior events.'
 
 
 48
 362 U.S. at 416, 80 S.Ct. at 826. As the dissent pointed out, the Court, in its decision, did not depart from the well established principle that 10(b) was a statute of limitations, 362 U.S. at 435, 80 S.Ct. 822 (dissenting opinion).
 
 
 49
 Holding, as we do, that 10(b) is merely a statute of limitations, and therefore may be waived, N.L.R.B. v. A. E. Nettleton and Company, supra, 241 F.2d at 133, the next question is whether, in the present case, the 10(b) defense was timely raised.
 
 
 50
 Section 10(e) of the Act provides, in part:
 
 
 51
 'No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'
 
 
 52
 As we pointed out earlier, the company failed to allege non-compliance with 10(b) both during the hearing, in its exceptions to the findings of the trial examiner, and in its intial appearance before the Board. The first and only time the issue was raised was in the company's motion for reconsideration, which was made after the company petitioned this Court for review of the Board's order. As we see it, the belated attempt to raise the 10(b) defense came entirely too late.
 
 
 53
 The regulations promulgated by the Board, pursuant to its power under 6 of the Act, 29 U.S.C. 156, specifically state that 'No matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding'. 29 C.F.R. 102.46(h). A second regulation, 29 C.F.R. 102.48(a) further provides:
 
 
 54
 'In the event no timely or proper exceptions are filed as herein provided, the findings, conclusions, and recommendations of the trial examiner as contained in his decision shall, pursuant to section 10(c) of the act, automatically become the decision and order of the Board and become its findings, conclusions, and order, and all objections and exceptions thereto shall be deemed waived for all purposes. * * *'
 
 
 55
 The company concedes that it failed to comply with these regulations but asserts that the 10(b) defense was raised in its brief to the trial examiner in support of its exceptions. This brief is not made a part of the record on appeal. But, assuming that it was included, the company is not saved for, under the regulations, 'Any brief in support of exceptions shall contain no matter not included within the scope of the exceptions * * *.' 29 C.F.R. 102.46(c). Therefore, this matter could not properly have been considered by the trial examiner.
 
 
 56
 Finding no 'extraordinary circumstances' to excuse the company's failure to raise the 10(b) defense in a timely fashion before the Board, see N.L.R.B. v. Ochoa Fertilizer Corporation, 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961), we are constrained to hold that the company is barred from raising the issue here.
 
 
 57
 We turn now to the merits of this case.
 
 II. The Section 8(a)(5) Violations
 
 58
 (a) Refusal to Confer at Reasonable Times
 
 
 59
 The Board found that although there were several legitimate delays and postponements by both parties during the negotiations, the company did not carry out its statutory obligation 'to meet at reasonable times and confer in good faith'. We agree.
 
 
 60
 Instances of the company's behavior are seen by the fact that throughout the negotiations, the company repeatedly insisted that it could not meet more than once a week for two hours, thus causing negotiations to drag out over a year. Furthermore, the company delayed negotiations two months in order to reply to the union's original proposal, and when it did, countered with a sketchy four page paper, thereby fairly indicating that the company could not possibly have used even a substantial period of the two month delay to work on its proposals. Then, in the middle of negotiations, the company abruptly announced that negotiations would have to cease in order to permits its chief negotiator to go on vacation.
 
 
 61
 These moves, we think, plainly illustrate the dilatory tactics employed by the company and warranted the Board's findings that such conduct was violative of its statutory obligation.
 
 
 62
 The company's chief defense to this charge was that its attorneys had other unions with which to negotiate and could not afford to spend more time in bargaining with Local 1257. This defense is plainly not valid. In an analogous situation, we held that the busy outside schedule of a negotiator-attorney 'does not exempt the employer from the normal requirements that nothing be done for the purpose of stifling an opportunity for discussion'. N.L.R.B. v. Exchange Ports Company, 5 Cir., 1965, 339 F.2d 829, 832. In this instance as well, 'there remains on the employer the positive legal duty to meet and confer with the Union at reasonable times and intervals'. 339 F.2d at 832-833. The question of reasonableness was for the Board, and in light of the other circumstances in this case, we are unable to say that its finding that the company's conduct was unreasonable was unjustified.
 
 
 63
 (b) Failure to Bargain in Good Faith
 
 
 64
 The Board found that throughout the negotiations the company exhibited an attitude of bad faith and lack of sincere desire to reach an agreement, thus failing in its duty to bargain in good faith, as imposed by 8(a)(5). We concur.
 
 
 65
 From the inception of its negotiations with the union, the company stood firmly entrenched in its belief that it had the right to retain unilateral control over such basic subjects as wages and hours. While this is not in itself a violation of the Act, N.L.R.B. v. American National Insurance Company, 343 U.S. 395, 409, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), it is a circumstance which may be considered by the Board in determining whether a party has bargained in good faith.
 
 
 66
 The climax was reached when, after nine months of utter futility, the union virtually surrendered its earlier proposals and agreed to abide by the company's existing practices and policies. Even then, the company remained unyielding and rejected this total surrender. It instead maintained, as it had repeatedly done, that its policy had been and would continue to be to handle all matters on a case-by-case basis. It felt it impossible to put its practices and policies into writing. Under these circumstances, we can hardly understand how the company could logically argue that it had a desire 'to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of labor', Globe Cotton Mills v. N.L.R.B., 5 Cir., 1939, 103 F.2d 91, 94; see, also, Majure Transport Company v. N.L.R.B., 5 Cir., 1942, 198 F.2d 735.
 
 
 67
 We are acutely aware that the Board has neither the power nor the authority to 'compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements'. N.L.R.B. v. American National Insurance Company supra, 343 U.S. at 404, 72 S.Ct. at 829. However, as was so ably stated in N.L.R.B. v. Reed & Prince Manufacturing Company, 1 Cir., 1953, 205 F.2d 131, 134-135,
 
 
 68
 'It seems clear that if the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employer in the course of bargaining negotiations. See Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 1940, 115 F.2d 759, 763. See also Smith, The Evolution of the 'Duty to Bargain' Concept in American Law, 39 Mich.L.Rev. 1065, 1108 (1941). Thus if an employer can find nothing whatever to agree to in an ordinary currentday contract submitted to him, or in some of the union's related minor requests, and if the employer makes not a single serious proposal meeting the union at least part way, then certainly the Board must be able to conclude that this is at least some evidence of bad faith, that is, of a desire not to reach an agreement with the union. In other words, while the Board cannot force an employer to make a 'concession' on any specific issue or to adopt any particular position, the employer is obliged to make some reasonable effort in some direction to compose his differences when the union, if 8(a)(5) is to be read as imposing any substantial obligation at all.'
 
 
 69
 See, also, N.L.R.B. v. Herman Sausage Company, 5 Cir., 1960, 275 F.2d 229. We think the Board's determination that the company failed to bargain in good faith, necessarily based on such subjective considerations as the company's motive and state of mind, was entirely correct.
 
 
 70
 We confess that rerely, if ever, have we seen a union bargained into submission in so devastating a fashion as was done here. Thus it must have been with tongue in cheek that the company claimed it 'really went beyond its legal obligation in enduring the union's obvious efforts to wear the company down'.
 
 
 71
 (c) Unilateral Changes During Collective Bargaining
 
 
 72
 The Board also found that the company violated 8(a)(5) by making certain unilateral changes in working conditions while negotiations with the union were in progress. The most significant change found to be made was the company's discontinuance of its previous policy of having annual wage reviews and granting annual wage increases to employees at WFAA-TV. The company's defense to this charge was that there was no policy of annual wage review and wage increase; thus, there was no deviation during negotiations.
 
 
 73
 We are of the opinion that there was substantial evidence in the record to support the Board's conclusion that the company had ceased its 'normally and regularly' granted wage increases because of the presence of the union.
 
 
 74
 The testimony of the company's chief negotiator, Mr. Blum, is particularly damaging to the company's defense that it had no prior practice of granting wage increases. On examination before the trial examiner, Blum admitted that when earlier asked about the company's actual practice on wage increases, he had replied, 'This is approximately our procedure of increases on an annual basis and in some cases where they were overdue, they were made retroactive'. When asked if the company's practice prior to 1966 was to grant annual increases, Blum stated, 'I'm going to qualify that a little bit. They were reviewed annually; they were not necessarily increased annually. In some cases wage increases were made retroactively; not in all cases at one time. In other words, in the course of the review some may have been made retroactive and some not'. Although he emphasized that wage increases were not always given on the anniversay date, he did state, 'I don't recall any year in recent years where we have not reviewed and granted a wage increase.'[1] The company conceded that no increase was given from the date the union was recognized by it and bargaining commenced.
 
 
 75
 Even more damaging to the company, and the point we believe is conclusive, were the conversations at various intervals between Cooper and employes at WFAA-TV in which he told them that the proposed increase was on his desk and would have been granted had the employees not organized and that if 50% Of the employees would disavow representation by Local 1257, a raise would be forthcoming in a short time. Thus it is readily apparent that the company, during negotiations, did digress from its practice of granting periodic wage increases, and did so only because of the intrusion of the union. Cf. N.L.R.B. v. Phil-Modes, Inc., 5 Cir., 1969, 406 F.2d 556.
 
 
 76
 The Supreme Court held in N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), that unilateral changes of working conditions by an employer during negotiations was as much a circumvention of the duty to bargain as was a flat refusal to bargain, even though there was no additional finding that the employee failed to bargain in good faith. Here, where there is a refusal to bargain in good faith, it is even clearer that such a change, without prior consultation with the union and effecting the most basic of all terms of employment, wages, was 'an impermissible unilateral change constituting a failure to bargain'. N.L.R.B. v. Citizens Hotel Company, 5 Cir., 1964, 326 F.2d 501, 505. We stated in that case:
 
 
 77
 'It is true, of course, as recently pointed out in N.L.R.B. v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, 479-481, that an employer may make changes without the approval of the union as the bargaining agent. The union has no absolute veto power under the Act. Nor do negotiations necessarily have to exhaust themselves to the point of the so-called impasse. But there must be discussion prior to the time the change was initiated. An employer must at least inform the union of its proposed actions under circumstances which afford a reasonable opportunity for counter arguments or proposals.'
 
 
 78
 326 F.2d at 505. The company's failure here to consult with the union before making the change converted what might otherwise have been a legal act into an illegal one.
 
 
 79
 We also agree that the Board was justified in finding that the unilateral increase in vacation benefits, without notice to the union, after being proposed by the union and rejected by the company, was illegal. There was some dispute as to whether the benefits applied to all of the company's employees, or only its non-union personnel. Had it been only the latter, such change would not have constituted an unfair labor practice. However, in view of the fact that the notice regarding the change was posted so that all employees could see it and the company made no effort to limit the change to non-union employees, the Board could reasonably conclude that the increased benefits affected union employees, thereby making the change illegal.
 
 
 80
 A more troublesome aspect of this portion of the Board's findings concerns the company's institution of wage changes at its Cedar Hill substation. This proposed change was discussed by the parties at the March 14, 1967, negotiating session. At that time, the company offered a $5 weekly increase but elimination of the employees' car allowance. The union objected to this proposal because it actually gave the employees less than they already received. Nevertheless, at the next meeting, the company announced that the change would be put into effect April 15.
 
 
 81
 The objections to unilateral changes in working conditions in N.L.R.B. v. Katz, supra, and N.L.R.B. v. Citizens Hotel Company, supra, were based on the fact that the changes there were made without any prior notification to or consultation with the union. But as we recognized in N.L.R.B. v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, 481:
 
 
 82
 'It is a mistake to assume that where there has been such discussion and fair notice of the employer's intended actions, it is a violation of the law to institute such changes without securing the agreement of the Union.'
 
 
 83
 We are of the opinion that since the subject of the Cedar Hill wage change had been raised during negotiations and the company gave the union notice of its proposed change, there was nothing unlawful in subsequently making the change. The Board's apparent error was in assuming that any unilateral change during bargaining is per se illegal. As we have pointed out, such change is illegal only if made under subterfuge, without giving the union notice and an opportunity to respond. Therefore, enforcement of that portion of the Board's order requiring the company to pay to the affected employees the amount of the excluded car allowance since April 15, 1967, is denied.
 
 
 84
 In all other respects, the order of the Board will be enforced.
 
 
 85
 No. 26,459, Local Union No. 1257 vs. N.L.R.B.
 
 
 86
 In this companion petition, Local 1257 seeks a modification of the Board's order issued against Belo Corporation. This petition, filed after the company's, was originally brought in the District of Columbia Circuit. Pursuant to 28 U.S.C. 2112(a), it was transferred to this Circuit and consolidated with Belo Corporation's petition for review.
 
 
 87
 The complaint issued against the company alleged, inter alia, that on and after July 5, 1966, the union requested 'data relating to existing policies and practices', and that these requests were consistently refused by the company. The Board, while conceding that proposals concerning the company's existing practices and policies were discussed, nevertheless found that the union at no time made an actual, specific request for the data. It therefore refused to order the company to hand this data over to the union. The union contends that the Board erred in so ruling. However, the conversations regarding this matter were both ambiguous and equivocal. Therefore, the Board was justified in concluding that no actual request was made, and that the company was not obliged to divulge the information at that time.
 
 
 88
 The union's next argument concerns the sufficiency of the remedy. The Board, in finding that the company had unilaterally discontinued the granting of wage increases during the period of negotiations with the union, ordered the company to retroactively implement a $10 wage increase, effective November 3, 1965. The union, however, argues that the Board erred in refusing to order the employer to 'reimburse his employees for the loss of wages and fringe benefits that they would have obtained through collective bargaining had employer not refused to bargain in good faith'.
 
 
 89
 Obviously, any attempt to fix the amount of wages the union might have obtained would rest on nothing more than surmise, conjecture, and speculation. Moreover, it would amount to having the Board make a contract for those who did not or could not or would not make one for themselves. The Board was right in declining to embark on such an expedition.
 
 
 90
 Except as modified in the one particular hereinabove set forth the orders of the Board in these cases are
 
 
 91
 Enforced.
 
 
 
 [1]
 The parties stipulated as to the salary of one employee, Thompson, who was at the top of the wage scale: November, 1955, $117.50; July, 1958, $122.50; April, 1960, $132.50; November, 1961, $137.50; November, 1962, $147.50; July, 1964, $152.50. This latter figure also represented Thompson's salary at the time of the filing of the unfair labor practice charge in 1967. Comparable weekly salaries at the company's competition, KRLD, were: 1956, $120.75; 1958, $135.70; 1960, $146.15; 1961, $151.15; 1962, $153.04; 1964, $158; 1965, $164.50; 1966, $170; 1967, $176.50