**WESTCHESTER ROCKLAND NEWSPA-
PERS, INC. d/b/a The Herald States-
man, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

Nos. 80, 81, Dockets 33396, 33551.

United States Court of Appeals
Second Circuit.

Argued Oct. 2, 1969.

Decided Nov. 3, 1969.

Thomas G. Dignan, Rochester, N. Y.
(Goldstein, Goldman, Kessler & Under-
berg, Rochester, N. Y., on the brief), for
petitioner.

Elliott Moore, Atty., for the N. L. R. B.
(Arnold Ordman, Gen. Counsel, Domi-
nick L. Manoli, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Coun-
sel, David London, Atty., on the brief),
for respondent.

Before FRIENDLY, SMITH and
FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Westchester Rockland Newspapers,
Inc. petitions to set aside an order of the
National Labor Relations Board, which
requires petitioner to bargain in good
faith with Newspaper Guild of New
York, Local 3, American Newspaper
Guild, AFL-CIO, and to embody any
understanding reached in a signed con-
tract. 174 N.L.R.B. No. 62 (1969).
This is a case where the Board's key
finding on the extremely narrow issue
before it was not supported by substan-
tial evidence on the record considered as
a whole. Accordingly, we grant the em-
ployer's petition and set aside the order.

Petitioner, hereinafter called "the
Company," publishes and sells various
newspapers, including the Herald States-
man in Yonkers, New York. After an
election in May 1967, the Guild was cer-
tified as the representative of various
employees in the Herald Statesman cir-
culation department. Collective bargain-
ing followed soon thereafter, but after
22 bargaining sessions full agreement
had not yet been reached. In January
1968, the Guild filed an unfair labor
practice charge with the Board, alleging

that the Company had engaged in surface bargaining, without a good faith intention of concluding an agreement, and by "these and other acts" had violated its duty to bargain in good faith.

The response of the Acting Regional Director to this charge created most of the problems in this case and makes it a highly unusual one. In May 1968, the Regional Director dismissed the charge insofar as it alleged a refusal to negotiate in good faith on wages and conditions of employment.[1] At the same time he issued a complaint, charging the Company with negotiating in bad faith, and more particularly:

> 11. On or about August 23, August 29, September 20 and November 20, 1967, when the Union requested Respondent to discuss and negotiate respecting the subjects of pensions, hospital and medical benefits, maternity leave, military leave, sick leave, severance pay, dismissal notice pay and related matters, Respondent, by Thomas G. Dignan, its Labor Relations Manager and agent, stated that it would not include in any agreement to be reached with the Union any provision respecting the subjects described herein above and thereby foreclosed any bargaining with respect thereto.

This was apparently inconsistent with the Regional Director's dismissal letter, which had found a willingness to bargain in good faith on terms and conditions of employment.

In July 1968, a hearing was held before a Trial Examiner, who, with commendable speed, issued his decision in August. The Examiner, faced with the inconsistent position of the Regional Director, bravely attempted to make some sense out of the situation instead of simply dismissing the complaint. He determined that the only issue left open to him was:

> Did the Respondent refuse to incorporate into the contract being negotiated—or in any contract—whatever agreement might be reached concerning certain conditions of employment, those enumerated in the complaint?

> \*　\*　\*　\*　\*　\*

> [T]here is such inconsistency between the Regional Director's dismissal letter and the complaint, as to preclude consideration now of any other theory of illegality or factual allegation of wrongdoing, however phrased, either in the complaint or in the briefs of the Union and General Counsel.

Both parties before us appear to accept this as a correct statement of the issue before the Examiner and the Board.

The Examiner concluded that the Company negotiator did say on "a number of occasions" that he did not want "to include some \* \* \* matters in a written agreement." The issues before the Examiner were thus very limited: What did the Company's words mean in the context of negotiations in which it was already established that the Company was negotiating in good faith on the issues before it, and did the Company's statements constitute a *refusal* to reduce agreed-on terms to writing? Instead of answering these questions, the Examiner went off on a tangent and never did explicitly resolve the issue as he originally saw it. Thus, he went on to say:

> But the real problem in this case is to distinguish between a company's request that the union agree to leave certain matters to the employer's discretion, as against what can be char-

---

1. The Regional Director wrote to the Guild:

   Insofar as you allege that the above-named Company negotiated from a predetermined position with respect to wages and certain other subjects of collective bargaining, the evidence is insufficient to support such conclusion. The evidence establishes that the Company considered your proposals and offered its own proposals for improvements and modifications for your consideration and was willing to negotiate with respect to those subjects. I am therefore refusing to issue a complaint with respect to the aforesaid allegation. The remaining portions of your charge are being processed further in a complaint being issued at this time.

acterized as adamant insistence that come what may, no matter what else might be agreed, never would the company yield its absolute freedom for independent action, contract or no contract.

This formulation apparently reframed the issues as follows: By stating that it would not put some matters into the contract, (1) was the Company merely refusing to concede on a particular term or (2) was it in effect refusing to discuss mandatory terms meaningfully by stating in advance that no agreement would be reached or (3) was it stating that certain agreements, even if reached, would not be written down? The Examiner evidently assumed that the first interpretation of the Company's statements would not evidence an unfair labor practice,[2] while either of the other two would.[3] However, interpretation (2) (refusal to discuss meaningfully by stating in advance that no agreement would be reached) had, in effect, been foreclosed by the Regional Director's letter. Although he apparently would not have accepted interpretation (3), as indicated below, the Examiner did not explicitly construe the Company's words; he concluded that since the refusal (either to discuss or put into writing) was not carried to impasse, it was not an unfair labor practice.

The Board, in reversing the Examiner, compounded the confusion. It stated:

We cannot agree that by engaging in such a course of bargaining, Respondent was merely requesting that the Union agree to leave certain matters to its discretion. On the contrary, it is clear from the evidence set out above that *Respondent asserted unequivocally on several occasions that it would not include in a contract any agreement that might be reached on certain mandatory subjects of bargaining.* * * * Further by stating

that it would not include even existing company policies in the contract, Respondent foreclosed bargaining with respect to these mandatory areas. Such foreclosure is tantamount to a refusal to negotiate about such subject matters and each instance is an independent violation of Section 8(a)(5) of the Act. Accordingly, we find that Respondent violated Section 8(a)(5) and (1) of the Act by *stating that it would not include in a contract any agreed on provisions concerning pensions, hospital and medical benefits, sick leave, severance pay, dismissal notice pay and incentive pay plan.* [Footnote omitted and emphasis added.]

The Board thus squarely held that the Company stated that it would not put certain agreed-to terms in a written contract. The Board also ruled that such a refusal to negotiate did not have to be pushed to impasse, evidently assuming this was the only difference between it and the Examiner.

■ The major problem before us is that the Board's finding that the Company "asserted unequivocally * * * that it would not include in a contract any agreement that might be reached" is not supported by substantial evidence on the record as a whole. There is no evidence at all in the record to show that the Company said, as the Board found, that it would not put any agreement into a written contract. The Company did use equivocal words, but not those the Board attributed to it. We realize, as did the Examiner, that the problem was to judge which of several meanings the Company's words might bear. But the Board did not say that it was interpreting the Company's statement; it found that the Company said something that it did not say. Moreover, if the question were one of interpretation, the evidence is overwhelming

---

2. See 29 U.S.C. § 158(d), which states that the collective bargaining obligation "does not compel either party to agree to a proposal or require the making of a concession * * *."

3. The obligation to bargain does include "the execution of a written contract incorporating any agreement reached if requested by either party * * *." 29 U.S.C. § 158(d).

that the Company did not mean to say—and was not understood by the Guild as saying—that the Company would not include agreed-to matters in a written contract. Thus, the record shows that the Company proposed early in negotiations that the parties put terms in writing as they were agreed upon and that the parties did reach agreement on "many points." Moreover, as the Examiner found, the interpretation with which the Company is now saddled did not occur to the Guild negotiator in bringing the charge, and no issue was made of it during the bargaining. The latter omission would be a surprising one if the Guild really understood the Company to have made the flat refusal the Board attributes to it, in view of the language of the statute which condemns a refusal to execute "a written contract incorporating any agreement reached if *requested* by either party." (Emphasis added). And finally, it is unreasonable to infer that an experienced labor negotiator would gratuitously suggest, much less insist, that hypothetical agreements not be reduced to writing, without any motive apparent in the record, if one assumes, as we must in view of the Regional Director's letter, that he is entirely willing to negotiate in good faith about the substantive terms.

The subsidiary basis of the Board order, that the Company "foreclosed bargaining" by stating that it would not include certain existing practices in the contract, is without merit. The Company is, of course, under no legal obligation to agree to keep its existing policies. The Board seems to concede this, but argues in this court that the Company's "manner" [4] of stating its position, rather than the fact of the position, caused the violation. While it is true that in certain circumstances the action of an employer in failing to offer even its present practices may be evidence of bad faith, it does not seem to us that such a refusal can itself, independent of subjective bad faith, be an unfair labor practice unless it is taken as evidence of refusal to discuss a particular item of mandatory bargaining. But that possibility is foreclosed here by the effect given by the Examiner to the Regional Director's letter, a position evidently adopted by the Board. The case cited to us on this point in the Board's brief is therefore clearly distinguishable.[5]

In sum, the Examiner and the Board attempted to fly on a broken wing. In considering itself bound by what may well have been an erroneous decision by the Regional Director,[6] the Board managed to create an unfair labor practice that did not occur, whatever may have been the other deficiencies of the parties in bargaining.[7] Accordingly, we feel compelled to set aside the Board's order. We do so with reluctance, since it means that the delay incident to litigation has deprived the employees of their rights to effective representation by a union selected by them in an election. It would be unfortunate if this procedural morass has relegated the Guild to its economic weapons to secure the employees' rights, and we trust that bargaining sessions will again commence. As to that, we note that our decision involves only the acts of the Company during the period complained of, and does not insulate it from an unfair labor practice charge based upon what may occur in the future.

The petition to set aside the Board's order is granted and the Board's cross-petition to enforce is denied.

4. Board brief at 5–6 n. 5.

5. A. H. Belo Corp. (WFAA-TV) v. NLRB, 411 F.2d 959, 968 (5th Cir. 1969), in which the Board found that "throughout the negotiations the company exhibited an attitude of bad faith and lack of sincere desire to reach an agreement."

6. Which we note could have been appealed by the Guild.

7. The Examiner pointed out that "a more reasonable attitude on both sides might have led to overall agreement."